UNITED STATES DISTRICT
NORTHERN DISTRICT OF NEW YORK

ARLENE DEAN,                                          3:23-cv-1370 (TJM/ML)
  individually & for all those similarly situated,        Civil Case No.:

                         Plaintiffs,

                                                          **VERIFIED CLASS ACTION**
      -against-                    **CIVIL RICO COMPLAINT**
                                      **(18 U.S.C. §1964) WITH**
**RESCUE DOGS RESCUE SOLDIERS CORP.,**     **INJUNCTIVE RELIEF**
**GLEN WILD ANIMAL RESCUE CORP.,**
**EL-LIZA'S DOG HOUSE INC,**
**ELIZABETH KELLER, MATTHEW GREENBERG,**   **Jury Trial Demanded**
**EVA SYNEK, JANE HOFFMAN,**
**ELLEN B. STEWART, ISAIAH BOWEN,**
**DONNA FOWLER, and DOES 1-10 being**
those persons who are accountants, veterinarians,
working, volunteering or associated with
**RESCUE DOGS RESCUE SOLDIERS CORP.,**
**EL-LIZA'S DOG HOUSE INC,**
                                  **Defendants,**
and **Meta Platforms, Inc**., a party in interest for purposes
of subpoenas and notice regarding the unlawful use and TOS
violations of its platform by Defendants and removal of such.

Plaintiff Arlene Dean, individually and on behalf of a proposed Class (the "Class" or "Plaintiff"),
by and through her undersigned counsel, as and for her Verified Complaint against Defendants
alleges as follows:

### NATURE OF THE ACTION

1.   Defendants use a sham charity in their scheme to collect hundreds of thousands of dollars a

year from generous donors throughout the country based on Defendants' malicious lies that they

rescue dogs from being killed at shelters and provide them quality care in a sanctuary where they

are trained to help disabled war veterans who adopt them.  Defendants' call this RESCUE DOGS

RESCUE SOLDIERS – a slick name preying on the sympathies of donors donating for their

hopeful investment in this public good for both dogs and disabled war veterans.  But Defendants'

use the donations for their personal lifestyles, including amassing an over One-Million Dollar real

estate portfolio and paying for their farm animals unrelated to the donations. Considering the donors fools, in 2020 Defendants organized a racketeering enterprise of using Facebook as their main source to spread frauds about their new modern facilities opening for the welfare of the dogs to get more money from the public and anyone who objects to Defendants are terrorized by them using Facebook to destroy their reputations.  Through this scheme, they collected hundreds of thousands of dollars each year while filing tax returns showing recurring deficits, with no explanation of the dogs' care or why their sham charity still collects money when Defendants clearly are incompetent to operate it.  Indeed, in August 2023, the Sheriff and SPCA found over 65 dogs locked in cages in dirty barns and sheds throughout Cherry Valley, languishing for years without care, toys, a bed or even a blanket.  There is no transparency, charity, board, adoption fundraisers, sanctuary, quality care, soldiers or training and not one dog is licensed or vaccinated to keep them unidentifiable while Defendants abuse and likely kill them.  Defendants contemptibly took twelve more dogs recently, for thousands of dollars each in donations-now over 76 dogs locked away.  Defendants' deceits include KELLER stating she attended veterinarian school to create an expertise she does not have[1] and websites fraudulently advertising their kennels owned by unrelated persons to steal their good reputations.[2]  This complaint seeks preliminary and injunctive relief, restitution, disgorgement of ill-gotten monies and other equitable relief to stop Defendant's ongoing donor deception and save the dogs.

**JURISDICTION AND VENUE**

2.  The Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because the claims arise under federal statutes pursuant to RICO, 18 U.S.C. §§1962 and 1964, and the Class Action

---

[1] See  https://www.allotsego.com/rescues-get-all-the-love-at-dog-house/  - "She decided to attend veterinary school for an associate's degree in vet science after holding a job in the banking industry."
[2] https://ellizasdoghouseatmossycreek.com/about-us

Fairness Act, 28 U.S.C. §1332(d) as the aggregate claims of the individual Class Members exceed the sum or value of $5,000,000, exclusive of interest and costs, and inclusive of punitive damages, treble damages and attorney's fees.  More than 100 putative class members exist and the amount in controversy by any one plaintiff is not less than $25, nor less than $50,000 of the aggregate of all claims. Many class members are citizens of different states from Defendants.

3.    Supplemental jurisdiction exists over the state claims pursuant to 28 U.S.C. §1367(a) as they are so related and part of the same case and controversy.

4.    Declaratory and injunctive relief is available under 28 U.S.C. §§2201 and 2202 and under RICO's 18 U.S.C. §1964.   At all times mentioned herein, Defendants' RESCUE DOGS website and Facebook page[3] were operational in New York and used by New York citizens, donors consumers everywhere who will benefit from a RICO 18 U.S.C. §1964 injunction as these sites perpetuate frauds to extract money from consumers and donors by using the federal wires.

5.    Venue is proper in this District under 28 U.S.C. §1391 (b)(2) and (d) and 18 U.S.C. §1965(a) because Defendants systematically conduct and transact substantial business in this district on a regular and daily basis and the causes of action occurred here.

6.    C.P.L.R. §§301 and 302 subject Defendants to personal jurisdiction in this state, and the causes of action herein arose out of their transactions with Plaintiff in the State of New York.

## PARTIES

7.    Plaintiff ARLENE DEAN is a citizen of Ulster County, New York, and a donor of funds to Defendant RESCUE DOGS RESCUE SOLDIERS paid per the charity's stated mission.[4]

8.    Defendants RESCUE DOGS RESCUE SOLDIERS CORP. ("Rescue Dogs") and GLEN

---

[3] see https://rescuedogsrescuesoldiers.org/index.html   and
  https://www.facebook.com/rescuedogsrescuesoldiers
[4] All allegations are made "at all times relevant herein".

WILD ANIMAL RESCUE CORP. ("Glen Wild") are New York Domestic Not-For-Profit Corporations formed under section 402 NCL (Not-for-Profit Corporation Law). RESCUE DOGS principal place of business is 1414 County Highway 50, Cherry Valley, New York and GLEN WILD's is PO Box 75, S Kortright, New York.

9.    Defendant ELIZABETH KELLER is a citizen of Otsego County, residing at 469 Barringer Road, Cherry Valley, New York and 1414 County Highway 50 Cherry Valley NY, and is the director of GLEN WILD and RESCUE DOGS.

10.   A 2015 Federal form 1023 filed by Defendant RESCUE DOGS and signed under penalty of perjury by KELLER for tax exempt status shows the following defendants and their positions:

- Defendant ELIZABETH KELLER as Executive Director;

- Defendant MATTHEW GREENBERG as Director residing at 69 East 130th Street. PHA, New York City 10037;

- Defendant EVA SYNEK as Treasurer residing at 47164 State Hwy 10, Delhi NY 13753; and

- Defendant JANE HOFFMAN as director pursuant to RESCUE DOGS Federal Tax form 990 filed for 2021, and residing at 55 W 14TH St APT 8D New York, NY 10011.

These defendants are collectively referred to as the Defendant BOARD.

11.   Defendant EL-LIZA'S DOG HOUSE INC ("El-Liza's) is a foreign for-profit corporation, operating under BCL 1304 as dog kennel located at 469 Barringer Road, Cherry Valley, New York

12.   Defendant ELLEN B. STEWART is the President, Treasurer, Secretary and Director of EL-LIZA'S ("EL" for Ellen Stewart and "LIZA'S" for Elizabeth Keller) DOG HOUSE, INC., with a corporate office at STEWART's residence at 20 Cedar Street, West Barnstable, Massachusetts, 02668. STEWART uses that residence address for many corporations she is director to, including 20 Contracting Corp Inc and Milcon Construction Corp that she used to get over $4.5 Million Dollars in PPP loans that, upon information and belief, were fraudulently procured.

13. For each of the corporate Defendants named above, their officers are individually liable as the corporate veil is pierced for using it as an alter-ego to commit frauds and crimes.

14. ISAIAH BOWEN resides at 3798 State Highway 166 and 1414 County Hwy 50 Cherry Valley New York 13320, which said properties are owned by Defendant KELLER's non-profits GLEN WILD and RESCUE DOGS.   Soon after serving about 5 ½ years for a violent felony charge related to the killing of a 15-year old girl in his car, in 2015 BOWEN associated with RESCUE DOGS by holding himself out as a dog trainer and works for EL-LIZA's.

15. Defendant DONNA ANN FOWLER is a 66-year old woman residing at 608 Delaware Ave, Roebling, NJ 08554-2002, who is a runner for Defendants KELLER, BOARD, STEWART and RESCUE DOGS by preying on the public using lies and frauds to extract cash donations and terrorize anyone who objects to Defendants' illegal conduct.

16. Defendants DOES 1-10 are those persons who are accountants, veterinarians, volunteers or anyone associated with Defendants RESCUE DOGS, EL-LIZA'S, KELLER and STEWART, whose names will be revealed in discovery in this litigation.

17. Meta Platforms, Inc. conducts business in this District as Facebook, through itself or its subsidiaries, over which it exercises complete dominion and control and is named a party in interest for purposes of subpoenas and notice regarding the unlawful use and TOS violations of its platform by Defendants and for removal of such prohibited posts and pages.

## FACTS

**The ACC New Hope Partner Program**
**Fosters Illegal Conduct and Money Scams**

18. Plaintiff DEAN has a love for animals and is interested in rescuing dogs from New York City's Animal Care and Control ("ACC") that is decried by the public for abusing and killing stray and homeless dogs.  Defendants stalked DEAN using a sham charity to extract money from her

and the public who want to recuse dogs from the ACC.

19.  The ACC operates a New Hope Program that lists 304 animal welfare not-for-profits contracted as ACC partners to take ownership of ACC dogs (called "pulling") and place them into permanent homes immediately by adoption or care for them prior to finding permanent homes. **Exhibit A**[5] – the New Hope Contract.  Unbeknownst to the public, the majority of those partners are not active or refuse to work with the ACC because it abuses dogs and the rescues. **Exhibit B**-10/23/23 Frasco Cert.

20.  Because of the ACC's hopeless program, people post pictures and stories on Facebook and Twitter of dogs about to be killed to collect pledge money to entice a rescue to pull a dog before it is killed, which ACC gives only 42 hours or less notice of when the dog will be killed.

21.  This short notice creates panic pledging where people from New York and other states literally donate their last $5 of their social security check and other funds totaling thousands of dollars per dog.  Panic pledging backfires because the people collecting pledges are not licensed or regulated and they and the pledgors do not follow-up about the welfare of the dog once pulled and never saw the rescue's premises or credentials.

22.  This creates bad actor rescues, such as Defendants, whose business model is to watch pledges rise on social media to the thousands then swoop in to pull the dog with the most money on its head, warehouse the dog in horrid conditions and return to social media to collect the next dog for profit, and not for the welfare of the dog.  Defendants also malevolently demand pledgors to dishonor pledges if another rescue pulls the dog because Defendants operate a racket to monopolize the pledge system.  **Exh B**.

23.  For example, Defendant STEWART on behalf of KELLER, BOARD and RESCUE DOGS

---

[5] All exhibits are incorporated into this complaint as if fully set forth herein.

makes large anonymous pledges during panic pledging to instigate others to donate, such as her anonymous $800 pledge for Cammy that she despicably dishonored and, in her typical vile language laced with cursing, demands everyone dishonor pledges if another rescue pulls a dog, as the below December 2021-January, 2022 Facebook posts show STEWART's unhinged rant that everyone is a liar and "Im not paying a cent to lend a paw. Let ACC honor my pledge":



**Plaintiff, Like Other Donors Nationwide, Unwittingly Donated Thousands to Defendants' Sham Charity**

24.  Defendants scheme was perpetrated on Plaintiff, when in April, 2023, Defendant FOWLER contacted Plaintiff on Facebook messenger with eerie messages that she was watching Plaintiff's interest in ACC dogs, and convinced Plaintiff she was a rescue by speaking in terms of "WE" to obtain her personal information such as her address and home environment. **Exhibit C.**

25.  On or about April 29, 2023, Fowler continued texting as a rescue stating "We" use a "rescue app" and "We" do not work with certain rescues because they are bad.  When Plaintiff wanted to talk to another rescue, FOWLER reprimanded her to only communicate with her as "that's why

WE work so hard to find people for the dogs." Exh C.

26.   On or about June 10, 2023, Plaintiff pledged a $1,000 for a dog named Ava. Immediately on June 11, 2023 FOWLER texts Plaintiff that Defendant KELLER wants to know if her $1,000 was legitimate so KELLER could pull the dog because she wants money for her sanctuary, and FOWLER stated she worked for KELLER who has a beautiful dog sanctuary upstate. Exh C.

27.   Plaintiff reviewed Defendant KELLER's and RESCUE DOGS website and Facebook stating they are a sanctuary with a charitable mission to save dogs trained to save war veterans. Nothing pulled more at Plaintiff's heartstrings than rescuing dogs and soldiers, and, as FOWLER described, Plaintiff understood it was a sanctuary with acres of land where dogs run free in fenced and unfenced areas in the grass, get daily exercise, toys, bones to chew and comfortable beds and blankets and are cared for by adequate staff while awaiting adoption.

28.   Based on Defendants' internet pages and FOWLER's representations as their agent, Plaintiff told FOWLER she would donate $1,000 if KELLER pulled Ava.

29.   FOWLER continued stalking Plaintiff to solicit money by enticing her with pictures of other ACC dogs, such as Shrimp, for RESCUE DOGS to pull if Plaintiff paid.   On June 17, 2023, FOWLER directed Plaintiff to send a $1,000 check to Rescue Dogs at PO Box 326, Cherry Valley, NY 13320.   However, Plaintiff paid through Pay-pal from defendant's website, but the receipt showed GLEN WILD so she called KELLER to ask where her money was.   KELLER never responded.   Instead, FOWLER responded that she had direct contact with KELLER and the payment was received.  Exh C.

30.   On June 17, FOWLER texted that RESCUE DOGS pulled Shrimp, but to keep that secret and FOWLER demanded Plaintiff pay KELLER for Shrimp.   On June 18, FOWLER insisted Plaintiff pay for another dog Macy, texting she "let her (meaning KELLER) know" the pledge was

made and on June 23 FOWLER texted "I wanted to tell you WE saved Macy, Liz (KELLER) knows about the 200 for a pledge."   Plaintiff was so conned by FOWLER and KELLER at that point that she exclaimed "OMG…So she saved, Ava, Shrimp and now Macy?...I told her more money to come…", and Plaintiff did send more money.  Exh C.

31.  On July 7 and August 16, FOWLER again stated that she is in contact with KELLER when Plaintiff complained KELLER never returns her calls. Exh C.  By August 24, FOWLER texted "WE try to save as many as possible", meaning KELLER is busy.  On August 30, Plaintiff texted FOWLER again that KELLER never responds but she will continue to pay KELLER to pull dogs.

32.  With the intent to make a hopeful investment in the charity's mission and specifically for the dogs she paid for, Plaintiff donated to RESCUE DOGS $1,400.00 in 2023 by two $500 payments totaling $1,000 for Ava on June 17 and July 3; August 24 -$100 for KC; September 14- $300 for Fortuna.  **Exhibit D** -Paypal Receipts.

33.  On July 15, 2023, Christine Dodaro messaged Plaintiff as an agent of KELLER, BOARD and RESCUE DOGS asking Plaintiff for $1,000 for Ava when Plaintiff already paid.  Plaintiff demanded to speak to KELLER as she suspected fraud  as KELLER never returned calls, never sent  donation receipts and only pressured her for more money through FOWLER and others. Plaintiff later discovered bad actor rescues request money already paid as a scheme to get double payments because oftentimes pledgors do not keep track and will re-send the money.

34.  Other suspicious events caused Plaintiff to disassociate from FOWLER and Defendants. For example, Plaintiff's June to September, 2023 complaints to FOWLER that KELLER never returned her calls were always responded with FOWLER insisting to speak through her as she had direct contact with KELLER.  Another incident was FOWLER casually stating in September, 2023 that she could get someone to kill whomever she wanted.  On September 11, Plaintiff saw

FOWLER's Facebook posts terrorizing an animal rights attorney, rife with salacious lies and inciting people to viciously attack the attorney's good reputation as KELLER, STEWART and FOWLER joined in there and on other pages, including illegally doxing the attorney by listing her personal phone number to harass her at home and FOWLER, KELLER and STEWART demanding everyone make false complaints to the state bar to harass the attorney.

35. On September 18 and 19, 2023 FOWLER contacted Plaintiff stating she was calling on behalf of KELLER and RESCUE DOGS to have people anonymously call the Bar Association and grievance committee to harass the attorney by false accusations, and FOWLER texted Plaintiff an address and phone numbers to the state bar and grievance committee. Exh C.

36. Plaintiff suspected why a charity spent so much time terrorizing people when it should be caring for the dogs and having them adopted as she paid for. Plaintiff wrote the attorney who responded with documentary proof of Defendant FOWLER, KELLER and STEWART's lies.

37. On or about October 14, 2023, Plaintiff informed FOWLER that she retained the attorney to protect her against FOWLER and the other Defendants' frauds and illegal conduct, particularly after witnessing their lies and terroristic threats on Facebook against people and organizations and reviewing the August, 2023 Sheriff's report showing over 65 dogs abused by Defendants. FOWLER responded that she recently visited RESCUE DOGS and that it was a beautiful sanctuary where dogs ran free, and she stated the Sheriff lied and his pictures were fake.

38. After Plaintiff informed FOWLER she had counsel, Defendants FOWLER, KELLER and STEWART ratcheted up their smear campaign with more salacious lies posted on Facebook, again viciously attacking Plaintiff's attorney to intimidate Plaintiff from suing them for their frauds.

39. Plaintiff next discovered that FOWLER uses Facebook to falsely accuse other persons and rescues of being liars, murderers and thieves and FOWLER lied on an adoption application that

she owned a home and was Grub Hub delivery driver as if she was financially secure to get a rescue to pull an ACC dog for her that FOWLER next refused to pay a fee or donation and dumped the dog 2-days later, then used Facebook to threaten the rescue, made false police reports and stalked the owner at her house. see Exh B-witness statement.   Plaintiff discovered other persons complained of FOWLER's death threats to ACC staff, that KELLER states the Sheriff's report and pictures is a lie and from all this Plaintiff concluded KELLER and her charity are a sham.

**Defendants Use Sham Charities Operating in Recurring Deficits**

40.  KELLER filed a number of charities purporting to care for dogs.  On February 10, 2000, she filed a not-for-profit corporation for Defendant GLEN WILD and on April 8, 2014, she filed a not-for-profit for Defendant RESCUE DOGS in Otsego County stating its purpose is "to rescue shelter dogs and train them to be service dogs for the disabled veterans of the Iraq and Afghanistan wars" and will fund all veterinary care for the dogs. **Exhibit E -** Certificate of Corporation.

41.  RESCUE DOGS' taxes show phenomenal revenues of $174,919.00 in 2017, $187,649 in 2018, $193,626 in 2019, $188,841 in 2020 and $157,684 in 2021. see tax filings at https://projects.propublica.org/nonprofits/organizations/465415775 .  However, suddenly in 2020, when Defendant STEWART got involved with RESCUE DOGS by combining her for-profit EL-LIZA'S with this non-profit, the taxes show recurring deficits of -$55,908 revenue and -$24,662 in net assets and in 2021 it shows -30,185 in revenue and -57,589 in net assets that can only be explained by Defendants misappropriating funds and being incompetent to operate a charity.

**The Sham Charities Are Used to Buy Real Estate For Keller
and Pay for Her Farm Animals and Personal Use**

42.  Defendant GLEN WILD, a charity owned by KELLER, owns various properties but has not filed an annual state CHAR500 or Federal 990 tax form, yet is listed as an active not-for-profit with New York's Department of State. **Exhibit F.**  Upon information and belief, KELLER keeps

this nonexistent charity active for her personal use to own properties.

43. On July 2, 2014, KELLER used GLEN WILD to buy a residence at 3978 State Highway 166 for $60,000, upon information and belief, purchased with charitable donations. It is valued at $300,000 considering Zillow comparable sales, and the below pictures show it before and after GLEN WILD purchased it, now in degenerate condition:



Before Keller purchased using Glen Wild          October 20, 2023 degenerate condition

44. On February 8, 2012, KELLER used GLEN WILD to purchase 1414 County Highway 50 by gift deed that keeps the sales price secret and to obtain tax benefits by using a charity in the transaction. This residential estate has 10 bedrooms at 4,894 square feet, that KELLER let this once pristine property become an eyesore, as the below pictures show:



Before Keller purchased using Glen Wild          October 20, 2023 degenerate condition

45. It is estimated at $427,900 on Zillow (see https://www.zillow.com/homedetails/1414-County-Highway-50-Cherry-Valley-NY-13320/53176309_zpid/ ) and sits on 10-acres that one

may think is used by Defendants for their charitable mission to rescue dogs and train them for

veterans, but Defendants KELLER, BOARD and RESCUE DOGS actually abuse dogs there by

hoarding them in a filthy barn as confirmed by the August, 2023 Sheriff report (see Exhs K,M)

and the October 20, 2023 declaration of neighbor Andrew Minnig. **Exhibit G**- 10/20/23 Minnig

Dec.  This property too is dilapidated as before and after pictures show. **Exhibit H**.

46.  Next, on or about December 27, 2021, KELLER used RESCUE DOGS to buy 143

Barringer Road for $85,000.  This is a 40x60 shop building, formerly a bottling plant for spring

water, located deep in the woods (see https://www.redfin.com/NY/Cherry-Valley/143-Barringer-

Rd-13320/home/181774199 ).  Zillow pictures below show it before KELLER purchased as a

windowless dark and dirty factory unacceptable to house dogs and surely not a sanctuary:





Pictures before Keller used a charity to purchase this factory

47. On or about June 14, 2019, RESCUE DOGS purchased 1455 County Highway 50 for

$174,900.  This is a two bedroom 864-foot residence with a 24x48 pole barn per the Town of

Cherry Valley property records.    Zillow estimates its value at $252,900 (see

https://www.zillow.com/homedetails/1455-County-Highway-50-Cherry-Valley-NY-13320/31626854_zpid/ ) and the property is pictured below:



House and Pole Barn before Keller purchased property

48.  The property values show Defendant KELLER amassed an over One-Million Dollar real estate portfolio using sham charities and charitable donations, also using those funds to care for her farm animals of donkeys and horses- all unrelated to RESCUE DOGS charitable mission of saving dogs.  Upon information and belief, Defendant STEWART has interests in those properties and BOWEN lives there.

**Defendants' Fraudulently Advertise on the Web Their
Sham Charity and Sanctuary to Extract Money from the Public**

49.  Defendants KELLER, BOARD and RESCUE DOGS operate a website advertising that they "provide quality care", "love and special care" to the dogs, "pet therapy programs" and "train rescue dogs as service dogs for soldiers injured in Iraq and Afghanistan" to "carefully pair the dogs with veterans," and lists people as "Trainer", including Defendant BOWEN, with donation buttons on the pages. **Exhibit I**.  All of these representations are false.

50.  The website shows war veterans Defendants state they train homeless dogs for and picture dogs, but, upon information and belief, those are not veterans or they are from years ago as are the dogs, and Defendants are not paying the veterinarian bills of those dogs as their corporate mission

states.  There is no update of dogs and soldiers on the website or their locations.

51.  Incredibly, Defendants list 20 dogs online at adopt-a-pet for anyone to adopt, not trained to pair with soldiers as their mission states, and some listings are nearly a year old because Defendants do nothing to promote their adoption or pair them with veterans. **Exhibit J**.

52. Defendants RESCUE DOGS Facebook page says it is sanctuary, with a few dogs photographed by Defendants KELLER and BOWEN shamelessly parading them on a strip of grass or in Defendant STEWART's EL-LIZA's office to defraud the public that they are free at a sanctuary with fresh air and green grass, as shown below:



53.  However, the below pictures from an August 2023 Otsego Sheriff investigation show the actual horrid conditions where the dogs are held hostage by Defendants. **Exhibit K** -more pictures:



**Defendants Illegally Threaten an SPCA Officer And Others**
**To Conceal Their Abuse of Over 65 Dogs and Criminal Conduct.**

54.  In 2023, Stacie Haynes of the Susquehanna SPCA complained to the Otsego Sheriff that "animals at 431 Barringer Road are in need and may be suffering", "It is supposed to be a dog rescue/shelter called Rescue Dogs Rescue Soldiers" and "a private dog boarding facility" and the

woman running it "was not running the facility" properly for a long time, other people complained, and Haynes concludes "I AM AFRAID OF WHAT WE MIGHT FIND." **Exhibit L**.

55. Defendants KELLER, BOARD and RESCUE DOGS responded to Haynes complaints by their usual bullying with a letter from an attorney (believed to be from Bovine, New York) to intimidate her from pursuing her complaint by illegally threatening to sue her when Agriculture and Markets Law §369 authorizes Haynes to protect dogs in danger as a member of the SPCA.

56. In August, 2023, KELLER belligerently refused the Sheriff access to investigate the premises, but later they gained access and found over 65 dogs at various properties of Defendants' KELLER, BOARD, RESCUE DOGS, STEWART and EL-LIZA'S, caged in filthy barns and sheds, without beds, blankets, toys, food and water and lying on dirty cold cement floors with peeling paint, in their own urine and feces, as the Sheriff report states the following:

"DOGS STACKED ON TOP OF EACH OTHER IN CRATES" (found at Defendant STEWART'S location called EL-LIZA'S)

"OVERWHELMED BY THE SMELL OF AMONIA/CLEANER/URINE TO THE POINT WHERE A MEMBER HAD TO EXIT THE BUILDING"

"DOGS...LIVING IN REALLY POOR CONDITIONS AS HOUSING AREA WAS COVERED IN FECES"

"FECES IN GARBAGE BAGS NEXT TO THE DOG CAGES"

- Emaciated dog

- Over 65 dogs and, "NONE OF THE DOGS ARE LICENSED" or vaccinated

- crate too small for the dog

- The Sheriff warned KELLER she could "FACE CRIMINAL CHARGES DUE TO THE LIVING CONDITIONS."    **Exhibit M -**Sheriff report.

57. The Sheriff found 10 dogs at 431 Barringer Road (believed to be a typo as it is 143 Barringer- the old water bottling factory), 54 dogs and 1 dog with long nails in a barn by a donkey,

3 donkeys, 2 horses and feral cats at 1414 County Hwy 50 and dogs stacked in crates at 469 Barringer Road that is owned by Defendants STEWART and EL-LIZA'S.

58.  Inexplicably, the Sheriff closed the case weeks without checking veterinarian records for all of the over 65 dogs or the emaciated dog that KELLER lied about arriving two-weeks before emaciated when it arrived two-months before that KELLER kept emaciated the entire time and, upon information and belief, failed to interview the alleged employee KELLER blamed for the bad conditions she said quit two-weeks ago when Hayne's of the SPCA complained the abuse existed for a long time (Exh L).  The Sheriff also re-visited only 1414 County Hwy 50 and ignored the other properties harboring dogs and ignored that no dog was licensed or vaccinated by law.

59.  The Sheriff's closing the investigation also ignored KELLER illegally storing and administering doxycycline to dogs without a veterinarian license or prescription that in an August, 2023 Facebook video she admits administering to dogs never seen by a vet nor sick.  Her acting as a veterinarian without a license by diagnosing dogs and administering medications is a Class E Felony under Education Law 6512 and Title VII section 6512 et seq of the Education Law.

**A Rescue Certifies That Defendants Abuse the Dogs**

60.  Pam Frasco, owner of a rescue organization, No Paw Left Behind, with some twenty years of rescue experience, certified on October 23, 2023 that the conditions detailed in the Sheriff Report and pictures show dogs "warehoused in deplorable conditions that no animal should be in" and RESCUE DOGS is not a sanctuary but solely motivated by profit to pull dogs with a price on their heads, with no concern for their welfare.  Exh. B.

**A Neighbor Certifies That Defendants Abuse the Dogs**

61.  Andrew Minnig lives next door to 1414 County Hwy 50 where KELLER, BOARD and RESCUE DOGS hoard 55 dogs, 3 donkeys, two horses and feral cats, according to the Sheriff

report.  He certifies that KELLER is incompetent, chaotic and a liar who has no concern for the animals or her neighbors. Exh G 10/20/23 Minnig Cert.   He certifies there is no quality of life for the dogs, they are fearsome dogs howling incessantly in distress for years, and when he complains an unidentified woman comes out of a house on the property and screams from outside to the dogs locked inside "SHUT UP!, SHUT UP!"

62.  For years, Minnig never saw a dog outside, walked or played with and KELLER admitted to him that she had problems with her dogs before in other counties that caused her to leave and go to Cherry Valley.  KELLER also told him she uses battery operated dog collars to keep them quiet.   Those can only be shock collars as they operate by batteries, and are just part and parcel of defendants abuse on dogs already stressed from the ACC shelter where Defendants pull the dogs.

**Defendants Take Twelve More Dogs While**
**Clearly Being Incompetent Personally and**
**Financially To Take Care of Any Dogs**

63.  From August 24 to October 10, 2023, Defendants contemptibly pulled TWELVE more ACC dogs named Pupsicle, Chocolate Shake, Bruckner, Pops, Hazel, King Brownie, Hera, Bialy, Flash, Lazarus and Bella Brown- now totaling over 76 dogs in Defendants' custody.

64.  It is offensive that they pulled 12 more dogs considering the complaint of Haynes of the SPCA, the Sheriff Report and Minnig's declaration proving Defendants are incompetent to care for the dogs, abuse the dogs there and their taxes show they are a financial shambles operating at a recurring deficit proving they should not take in any more dogs if they do not have the income for their care.

65.  The Defendants immoral and malicious motives solely to reap profits from the dogs is clear as the 12 dogs came with a price on their heads from the panic pledges.  Averaging even the least amount of $1,000.00 per dog means Defendants pulled in a cool $12,000.00 in less than a month

and a half for doing nothing but pulling innocent souls as commodities to warehouse away.

**Defendants' Are an Enterprise Racket Using A Sham Charity to Steal Money**

66.  Since January 2020 to date, Defendants KELLER, BOARD, BOWEN, FOWLER, all individuals, and RESCUE DOGS, a corporation, associated to form an enterprise with Defendants STEWART, an individual, and EL-LIZA'S, a corporation (collectively, the "Enterprise"), for the common purpose of defrauding the public to pay money in the form of donations to their sham charity RESCUE DOGS based on deceits that they are expanding RESCUE DOGS to a larger and modern facility with veterinarians on the premises and for that they need more donations.

67.  Defendants have no qualms about publishing their frauds as they consider their donors fools for having hearts for the dogs, so on June 15, 2020 Defendants STEWART and KELLER took their scheme to the ultimate step of publishing a Facebook post of their illegal racket:

(a)  KELLER and STEWART with the ACC have been saving dogs lives;

(b)  to save more dogs, KELLER and STEWART need more money to expand their operation to "turn NYCACC into a "no kill shelter"" ;

(c)  They train dogs before being released for adoption so they have to board the dogs and boarding, training and veterinarian care "is very costly, and the more dogs we pulled, the more funds we needed";

(d)  they were purchasing "a state of the art indoor outdoor kennels" for 36 more dogs for the not-for-profit charity RESCUE DOGS that STEWART's "creative financing" led to KELLER and STEWART owning kennels operated as EL-LIZA'S, a for-profit business;

(e)  They need donations for the not-for-profit to support the for-profit as the not-for-profit RESCUE DOGS will "upgrade…to a full service kennel, board, and training facility, with grooming services, and we will offer much needed veterinary services to the townspeople" and "transport" of the ACC dogs for the not-for-profit" "from NY to El-Liza's"; and

(f)  EL-LIZA'S net proceeds all go to the charity RESCUE DOGS.

68.  That post is in the below screen shots, read from left to right to the next row:



69.  A week before that post, on July 10, 2020, STEWART formed the for-profit business of

EL-LIZA's as the kennel and grooming facility.

70.  The frauds in that post include that STEWART and KELLER do not save nor train dogs as

their business model is to grab dogs with pledges on their heads for profit and warehouse them

away, without fundraisers or any work to get them adopted. Moreover, STEWART and KELLER are a danger to the dogs as, in addition to warehousing them away, they make anonymous pledges then dishonor their pledges and demand everyone dishonor pledges and they terrorize other recuses and persons who are saving the dogs that STEWART and KELLER could not pull. Additionally, STEWART and KELLER never created a bigger and better facility to care for the dogs as the Sheriff recently found dogs at EL-LIZA'S in cages stacked on top of each other and 65 others in distress at filthy barns and sheds throughout Cherry Valley in conditions the Sheriff neighbors and other recuses state are criminal abuse. Nor did KELLER and STEWART create a facility with veterinarian care or transport to the ACC. In fact, KELLER and STEWART know the ACC provides transport of its dogs at its expense, so their lies of creating a transport were concocted to deceive the public to donating money to the sham charity RESCUE DOGS that Defendants illegally combined with the for-profit business EL-LIZA'S-an illegal enterprise.

71. Most disturbing is their post makes clear that if people donate more money then KELLER and STEWART can make the ACC a no-kill shelter as their facility will be large enough to save every dog destined for death at the ACC. That is proven false by the fact that one recuse can not possibly save every dog from the ACC and get them adopted as there are thousands killed a year, which is why the ACC partnered with 304 rescues in its New Hope Program as it would take hundreds of recuse to do that. Furthermore, Defendants proved they will not care for the dogs anyhow as the Sheriff found over 65 dogs warehoused in deplorable conditions three years after this post.

72. Defendants post was nothing but more delusions of KELLER and STEWART who have a history of frauds as explained above. Additionally, their website for EL-LIZA's advertises for over the past three years that it is family owned since 1993 by a local couple that lives on the

premises as shown below:



From https://ellizasdoghouseatmossycreek.com/about-us on 10/31/23

73. Those lies by STEWART and KELLER are to entice the public to pay for Defendants' services by stealing a family's good reputation when in fact STEWART owns it and KELLER operates it; and between the two of them it is a shambles, they are in disrepute, the property is derelict and they illegally stock medications and stack dogs in cages there.

74. Upon information and belief, the Enterprise includes RESCUE DOGS the non-profit sharing income, expenses, and receipts with the for-profit EL-LIZA'S and vice versa, where they double-dip in tax deductions and use the charity status of RESCUE DOGS to gain tax and other benefits, including grant money and loans shared with EL-LIZA'S and Defendants pay their runner FOWLER to promote the sham charity RESCUE DOGS for donations by her frauds and lies on Facebook as explained above. The Enterprise's racket includes terrorizing anyone that objects to their illegal conduct, including using the wires such as Facebook for that.

75. Defendants promote their sham charity RESCUE DOGS on the wires using the internet for its website and Facebook pages fraudulently stating it is a sanctuary with quality care for dogs with donation buttons for donors nationwide to send money via the wires to Defendants' bank

account. Defendants also use the wires by Zelle and Paypal to collect money going to KELLER's email at liznewyorker@gmail.com.  Defendants use the mails to collect checks from defrauded donors throughout the United States and they use the mails to send letters requesting money and grants from the public and other entities for their sham charity.

76.  The collection of hundreds of thousands of dollars by this Enterprise as shown on RESCUE DOGS taxes came from interstate donors, and Defendants reinvested this racketeering money by paying (a) insurance for RESCUE DOGS as their taxes state, (b) insurance on the properties purchased by RESCUE DOGS, GLEN WILD and STEWART and EL-LIZA'S, (c) cheap dry food for the dogs warehoused to keep them barely alive so the Enterprise can use them for more donations, (d) fees paid to the State Department of Corporations and Department of Agriculture to keep the Enterprise active  (d) other fees such as utilities and professional fees for accountants to file their taxes and state charity documents, which all further enables the Enterprise to exist and profit from their racket that is completely illegal

**Defendants Are a Sham, Violating Numerous State and Federal Laws**

**Agriculture and Markets Law and Education Law Violations**

77.  Defendants violate Agriculture and Markets Law Article 7 §106, 108 and 109 directing all dogs must be licensed with proof of vaccinations except dogs at a "pound or shelter maintained by or under contract or agreement with the state or any county, city, town or village, duly incorporated society for the prevention of cruelty to animals, duly incorporated humane society or duly incorporated dog protective association."  Defendants are not a pound or shelter and admitted to the Sheriff not one of their over 65 dogs was licensed or vaccinated.

78.  Defendants violate Agriculture and Markets Law §350 defining torture of animals as every act, omission or neglect that permits unjustifiable pain, suffering or death, which the Sheriff stated

they are subject to criminal charges for the conditions they kept the dogs in.

79.  Section 353 make it is a class A misdemeanor to torture any animal and deprive them of necessary food and water and §353-a making it a felony for intentional killing or causing serious physical injury to an animal. The Sheriff found an emaciated dog and others in conditions that were criminal, and no food or water in the dogs bowls as the Sheriff pictures show.

80.  Defendants violate Section 369 that makes it a misdemeanor with up to a year of prison or a fine up to a thousand dollars when a person interferes with an officer or society for prevention of cruelty to animals to discharge their duties.  The Sheriff's report states defendant KELLER refused them entrance and SPCA director Stacie Haynes was threatened by KELLER's lawyer to interfere with her duties, as well as KELLER lied to the authorities that the emaciated dog was like that for two weeks when it was over two months and she lied that an employee was responsible for the horrid conditions that happened only on the past two week when Haynes reports those conditions were for a long time.

81.  Section 377-a et seq requires all animals spayed and neutered before any shelter or pound can release them for adoption and requires certain documentation, yet Defendants failed to produce such documentation and admit none are licensed.

82.  It is a Class E Felony under Education Law 6512 and Title VII section 6512 et seq of the Education Law for KELLER to administer doxycycline to dogs, yet KELLER illegally acts as a veterinarian and diagnoses dogs and administers drugs to them without a veterinarian license.

**Defendants Violate Federal & State Deceptive Practices Laws**

83.  Defendants engage in deceptive practices and misrepresentations to the public in violation of  N.Y. EXEC. LAW §§ 63(12) and 172-d.2-4; N.Y. GEN. BUS. LAW § 349 and N.Y. NOT-FOR-PROFIT CORP. LAW § 719 and Section 5 of the FTC Act, 15 U.S.C. § 45(a) as they certify

state and federal 990 and CHAR financial filings under penalty of perjury that the information is true and accurate when they are false and misleading by, upon information and belief, including (a) fictional and other loans created by Defendant STEWART and Defendant EL-LIZA's to reap benefits from the non-profit RESCUE DOGS, (b) loans for Defendants' personal use, (c) deductions for personal expenses and (d) using charitable revenue for Defendants' personal use.

84. Defendants violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), NY EXEC. L. §§ 63(12) and 172; N.Y. GEN'L BUS. L. §349 in connection with soliciting charitable contributions from donors for a purported charitable organization in whose name solicitations can be made using solicitation materials, such as the internet, brochures, donor invoices, and thank you letters that misrepresenting the program of Defendants RESCUE DOGS when there is no training program or sanctuary for the dogs, no soldiers nor are donations used for their welfare.

**Defendants Violate New York Law Governing
Charitable Organizations and their Principals**

85. The Not-for-Profit Corporation Law ("N-PCL) governs Defendants KELLER, BOARD, RESCUE DOGS and GLEN WILD, including that they must abide by their stated mission statement. Defendants violated all of these laws as the above facts explain, specifically the following laws.

86. N-PCL §405 requires an organizational meeting of all of the directors. N-PCL §§552- 558 mandates management of funds when a donor provides a gift for a specific purpose. N-PCL §§601-623 mandates certain written notice of corporate meetings and at least annual meetings held by the directors with quorums and voting on issues with correct and complete books and records of account and minutes of proceedings of its members, board and executive committee kept at the corporate office books and records of these meetings are kept. None of these laws have been followed by Defendants.

87.  N-PCL § 717(a) requires Directors, Officers, and Key Persons of not-for-profit corporations to "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." N-PCL § 717 requires that they act with undivided loyalty toward the corporation profit.  N-PCL § 720, holds them liable for the "neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge" or "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties, and to "set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness." None of these laws have been followed by Defendants.

88.  Executive Law § 172-d. prohibits charities from engaging in fraud to obtain money by solicitations and not apply that money for the charitable purpose and fail to maintain books and records, solicit contributions in a coercive manner and use an address for the charity that is not where it is located, among other prohibitions.  Section 174-b requires any solicitation to state the charity's clear purpose, financial records, the number of the attorney general to obtain information on the charity.

89.  In violation of the aforesaid laws, Defendants KELLER, BOARD, RESCUE DOGS have mismanaged and misappropriated charitable funds for their personal use as the funds are not used for the welfare of the dogs or the charitable mission that the public invests in and donors intended gifts for specific dogs are not managed or accounted for the dog.  Defendants also clearly do not hold requisite board meetings and are lack business acumen to create a financial committee or financial plan as their abject incompetence is clear by the fact the charity operates in a deficit and is a sham that hoards and abuses dogs while stealing money from the public for

KELLER's personal use, her real estate portfolio and financing STEWART's business.

## CLASS ACTION ALLEGATIONS

90.   Plaintiff seeks redress in her individual capacity and on behalf of a Class consisting of similarly situated consumers. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) or (b)(3), Plaintiffs seek Class certification of a Class defined as follows:

91.   "From June, 2020 to date, all persons nationwide, including New York State, who paid donations to defendants RESCUE DOGS RESCUE SOLDIERS , BOARD, and KELLER."

92.   Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or subclass divisions after discovery. Excluded from the Class are: (i) any judge presiding over this action and their family members; (ii) defendants, their subsidiaries, successors, or any entity in which defendants or a parent company may have a controlling interest, their current or former employees, officers, or directors; (iii) persons that properly exclude themselves from the Class; and (iv) the legal representatives, successors, or assignees of any properly excluded persons.

## NUMEROSITY

93.   The potential Class members as defined are so numerous and diversely located throughout the U.S. that joinder of all Class members is impracticable. While the exact number of Class members is unknown because such information is in the exclusive control of defendants, upon information and belief, the Class is greater than 100 individuals.

## COMMON QUESTIONS OF LAW AND FACT

94.   There are questions of law and fact common to Plaintiff and the Class that predominate over any questions affecting only individual Class members, such as whether:

   a)  Defendants violated New York's General Business Law §349 and §350 by their pages on the web advertising them as a sanctuary for dogs that trains dogs to pair them with war veterans;

b) Defendants engaged in, and continue to engage in, unlawful, fraudulent, and unfair practices that are substantially likely to mislead the public, and therefore members of the Class, namely by knowing the true horrid conditions they subject the dogs to and actively concealing that from the consuming public paying for their welfare;

c) Defendants fraudulently and unfairly misrepresent to Class members that it is properly training and caring for the dogs when there are no trainers nor appropriate staff to care for the dogs and the dogs who are actually abused;

d) Defendants false and misleading statements concerning their services were likely to deceive the reasonable consumer;

e) Defendants operated an illegal enterprise to defraud the public to donate hundreds of thousands a year for years to Defendants sham charity where the money was not for the charity's stated mission and did not benefit the dogs that Defendant never promoted for adoption or trained for veterans nor were at a sanctuary but were discovered abused in filthy barns and sheds;

f)Class members are entitled to actual and/or statutory damages and the appropriate amount of damages due the class must be determined; and

g) Declaratory and injunctive relief is available in this action.

## TYPICALITY

95.  Plaintiff's claims are typical of the claims of the Class as being defrauded out of money to pay a sham charity for the care of dogs that has resulted in, and will continue to cause, irreparable harm to the public and the dogs as a public charitable mission is a fraud, but for immediate action by the Court.

## ADEQUACY OF REPRESENTATION

96.   Plaintiff will fairly and adequately assert and protect the interests of the class and has retained competent and experienced counsel in both federal and state class action litigation, appointed class counsel before and experienced in this type of case.

## PREDOMINANCE

97.  Questions common to the class predominate over those that only affect individual owners. This case involves Defendant's deceptive practice in advertising its services as a public charity

for a public benefit to the consuming public to pay for that, all of which was fraudulent, and it involves Defendants illegal enterprise using the mail and wires to extract that money for Defendants' use, and will primarily be predicated upon the jury's evaluation of Defendant's sales, advertising, practices and conduct in regards to its charitable services provided.

## SUPERIORITY

98.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all of the Class members is impracticable. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

## INJUNCTIVE RELIEF.

99.   Donors have suffered and will continue to suffer substantial injury as a result of Defendants' violations of federal and state law, as well as the dogs injuries continue.  Defendants are unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants will continue to injure dogs and the donors who have an interest in their welfare, reap unjust enrichment, harm the public interest and abuse the dogs.   Final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## COUNT ONE (RICO)

100.  The averments of each paragraph above are restated here as if fully set forth herein.

101. All Defendants activities affect interstate commerce and, together with others known and unknown, did knowingly and intentionally conspire to conduct and participate, and did conduct and participate, directly and indirectly, this sham charity enterprise through a pattern of racketeering activity, since January 2020, as defined in 18 U.S.C. § 1961(1) and (5), consisting

of multiple acts indictable under mail and wire fraud, 18 U.S.C. §§ 1341, 1343 (1976),  and

state-law criminal fraud, N.Y.P.L. §190.65 to collect hundreds of thousands of dollars in

donations annually since 2020 via donate buttons on their web and Facebook pages and using

Paypal, Zelle and Facebook's donation wires and mailed checks to collect the money by fraud.

102.  Plaintiff and all those similarly situated were injured in their property by reason of

violations of 18 U.S.C. §1961 and 1962 by all Defendants stealing their money by these frauds

detailed in this complaint.

**COUNT TWO (Fraud)**

103. The averments of each paragraph above are restated here as if fully set forth herein.

104.  All Defendants by their web advertisements and Facebook posts to the public made

material statements that they rescue dogs to provide quality care for and train in a sanctuary

setting to pair them with war veterans, made those statements knowing they are false and with

intent to defraud Plaintiff and all those similarly situated to pay them donations.

105.   Plaintiffs reasonably relied on those fraudulent statements and suffered damages of their

donation money paid with the intent to make a hopeful investment in the charity's mission for

the welfare of the dogs and war veterans.

106.   By reason of this fraud, the corporate veil is pierced and Defendants BOARD and

Stewart are personally liable for all damages.

**COUNT THREE (NY General Business Law §349)**

107.  The averments of each paragraph above are restated here as if fully set forth herein.

108. New York's General Business Law §349 prohibits "[d]eceptive acts or practices in the

conduct of any business."

109. Plaintiff and all others similarly situated made donations as consumers with the intent to

make a hopeful investment in the charity's mission for the welfare of the dogs and war veterans based on all Defendants website and Facebook advertisements detailed herein above.

110.  All Defendants' acts and practices are not unique to the parties and have a broader impact on the public that has paid via the wires and mails throughout the United States and others that have not paid but promote the Defendants' sham charity in belief that it is doing good.

111. All Defendants conduct, acts and practices in its business were and are materially misleading and deceptive because their claims are false and Defendants made their representations to Plaintiff and the public when Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

112. As a result, Plaintiff and the proposed Class have suffered damages in an amount to be determined at trial.

113. Plaintiff further seeks to enjoin such unlawful deceptive acts and practices described above. Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively advertise its charitable services under the guise of a sham corporation.

114.  Each Plaintiff demands compensatory damages in the form of the greater of their actual damages or statutory damages of $50 per violation. In addition, pursuant to G.B.L. §349, Plaintiff and the putative class seek injunctive and declaratory relief declaring the advertisements deceptive and prohibited by statute, and to enjoin use of the deceptive advertising and conduct.

## COUNT FOUR (NY General Business Law §350)

115.  The averments of each paragraph above are restated here as if fully set forth herein.

116.  New York's General Business Law § 350 provides, "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

117. With regard to New York consumers, Defendants advertisements were false and misleading in a material respect and were directed at and misleading to reasonable consumers.

118. With regard to New York consumers, Plaintiff and the putative class have been aggrieved by Defendants' false advertising, and demand compensatory damages in the form of the greater of actual damages and/or statutory damages of $500 per violation. In addition, pursuant to G.B.L. §350, Plaintiff and the putative class seek injunctive and declaratory relief declaring the advertising deceptive and prohibited by the statute and to enjoin further deceptive advertising.

### COUNT FIVE (Negligent Misrepresentation)

119. The averments of each paragraph above are restated here as if fully set forth herein.

120. Defendant RESCUE DOGS was in a special relationship with the Plaintiff and the proposed Class by advertising as a charity for the public good.

121. Defendant made false representations that it should have known were incorrect and was known by Defendant to be desired by the Plaintiff and the class for a serious purpose to care for the dogs they paid for, and for war veterans.

122. Plaintiff and the class intended to rely and act upon it, and they reasonably relied on it to their detriment as they all paid money based on false representations.

### COUNT SIX (Unjust Enrichment)

123. The averments of each paragraph above are restated here as if fully set forth herein.

124. All Defendants are enriched and benefited from the donations they procured by fraud to Plaintiff and putative class members having been deceived by their Facebook posts and advertisements and were thereby caused to pay donations.

125. The circumstances are such that equity and good conscience require Defendants to make

restitution to Plaintiffs and putative class members for its enrichment, which came as a result of the deceptive and misleading advertising, and not be permitted to retain the revenues accrued from those donations from Plaintiff and putative class members.

### COUNT SEVEN (Breach of Fiduciary Duty)

126. The averments of each paragraph above are restated here as if fully set forth herein.

127. Defendant RESCUE DOGS, BOARD and KELLER operate under state laws as a charity for the public, and their duty is to the public to raise funds for a stated mission, not commit fraud.

128. Said Defendants breached their fiduciary duties to the public, including their obligations pursuant to N-PCL § 717 and failed to discharge their duties with the degree of care, skill, prudence, diligence and undivided loyalty required of her them to handle charitable funds and assets fand used them instead for their private benefit and noncharitable purposes, including benefitting the for-profit business of Defendants STEWART and EL-LIZA'S.

### COUNT EIGHT (Accounting)

129. The averments of each paragraph above are restated here as if fully set forth herein.

130. Plaintiff and all those similarly situated are in a fiduciary relationship with Defendants KELLER, BOARD and RESCUE DOGS as they are acting as a public charity for the public good and Plaintiffs invest in that mission by sending them donations for their specific mission.

131. Plaintiff seeks an accounting of all books, records and financials of Defendants RESCUE DOGS, GLEN WILD and EL-LIZA'S as in June, 2020 KELLER announced with STEWART they own EL-LIZA'S and that corporation is integrally intertwined with RESCUE DOGS using its property as RESCUE DOGS kennels and sharing revenue.

### PRAYER FOR RELIEF

*WHEREFORE*, Plaintiff prays for relief as follows:

a. Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of donor injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, a preliminary injunction, removal of the corporate officers and directors of each Corporate

Defendant, an accounting of assets, and appointment of a receiver;

b.   Enter a permanent injunction to prevent Defendants from future violations of the law, including that Defendants, their subsidiaries, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or reviving the unlawful conduct alleged herein with respect to their services;

c.   Award such relief as the Court finds necessary to redress injury to donors resulting from Defendants' violations, including, but not limited to, removal of the corporate officers and directors, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

d.   That the Court determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, and designate Plaintiff as representative of the Class and her counsel of record as Class counsel.

e.   That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of GBL 349 and 350 and judgment be entered for Plaintiff and the members of the class and against Defendants for threefold the amount of damages sustained by Plaintiff and the class, together with the costs of this action, including reasonable attorneys' fees;

f.   That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of the common law and statutes of New York, and that judgment be entered for Plaintiff and the members of the class and against Defendants for the amount of damages determined to have been sustained by them or otherwise allowed by law;

g.   That Punitive damages be granted to Plaintiff and the Class;

h.   That compensatory damages, restitution and all allowable damages, including pre-judgment and post-judgment interest, be granted to Plaintiff and the Class for all violations alleged herein; and

i.   Award Plaintiff the costs of bringing this action, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

Dated:   October 31, 2023          **LAW OFFICES OF SUSAN CHANA LASK**

  /s/ Susan Chana Lask
Attorney for Plaintiff & the Putative Class
244 Fifth Avenue, Suite 2369
New York, NY 10001
(917) 300-1958
scl@appellate-brief.com

## VERIFICATION OF PLAINTIFF

I, ARLENE DEAN, verify as follows:

1. I am over the age of 18 years old, read and write the English language and at all times alleged, I was a resident, citizen and domicile of New York.

2. I have personal knowledge of the facts set out in the foregoing *Verified Complaint*, and if called to testify I would competently testify as to the matters stated therein, and as to matters alleged upon information and belief.

Under 28 USC section §1746, I verify under penalty of perjury that the foregoing is true and correct.

Dated: October 31 2023

ARLENE DEAN